B. F. Bryan alias Buster Bryan v. State.

194 So. 385
Division A
Opinion Filed February 2, 1940
On Rehearing March 8, 1940

*Oxford & Oxford,* for Plaintiff in Error;

*George Couper Gibbs,* Attorney General, and *Thomas J. Ellis,* Assistant Attorney General, for Defendant in Error.

BUFORD, J.—The writ of error brings for review judgment of conviction of murder in the second degree under an indictment charging murder in the first degree.

Plaintiff in error presents in his brief thirteen (13) questions. The first, second, eighth and thirteenth questions challenge the sufficiency of the evidence. The third, fourth, fifth, sixth, tenth, eleventh and twelfth questions challenge the correctness of the court's charge to the jury. The seventh question is:

"Must a defendant or his counsel be present at every stage of the trial where the defendant is being tried under the charge of first degree murder?" And the ninth question is:

"May the State's attorney in cross examination of defendant require him to answer touching his knowledge of the deceased's family and then state, 'Then you were willing for his family to suffer?' "

It is entirely unnecessary for us to detail the evidence in this case. There were some conflicts.

There were conflicts also between what some witnesses testified to at the trial and what they had theretofore testified at an inquest or had stated on other occasions. It, therefore, became a question for the jury to determine which statement portrayed the truth. It is immaterial whether a witness is introduced by the State or by the defendant. The jury may consider the testimony of a witness just the same in either event and it is a matter for the jury to determine, if it can, who is and who is not speaking the truth as a witness before the jury.

There is ample evidence in the record to support a verdict

of murder in the first degree, if that evidence had been given full credit by the jury and certainly there is sufficient evidence to support a verdict of murder in the second degree. See Gavin v. State, 42 Fla. 553, 29 Sou. 405; Blanton v. State, 52 Fla. 12, 41 Sou. 789; Smith v. State, 66 Fla. 135, 63 Sou. 138; Powell v. State, 88 Fla. 366, 102 Sou. 652.

Plaintiff in error complains that the court charged the jury on the law of drunkenness as an excuse for crime and plaintiff in error contends that there was no proof of drunkenness on the part of defendant. The charge complained of was as follows:

"Drunkenness as an excuse for the commission of an unlawful act is no defense and mitigates no degree of unlawful homicide except murder in the first degree where drunkenness may be so complete as to eliminate the possibility of entertaining a premeditated design to kill.

"Intoxication, as an excuse for murder in the first degree does not apply to murder in the other degrees. If you believe from the evidence that the defendant at the time of the alleged homicide was in such an intoxicated condition and his drunkenness so complete as to render him incapable of forming a specific design and intent to kill and to eliminate the possibility of his entertaining a premeditated design to kill, or if there is a reasonable doubt in your minds as to same you cannot convict him of murder in the first degree."

We do not think the charge constituted error. There was substantial evidence that the defendant had been drinking intoxicating liquor during the night on which the homicide occurred. He was operating what is described by the witness as a beer garden and dance hall. The homicide occurred sometime about midnight or probably a little later. The testimony given by the defendant as a witness in his

own behalf was vague and uncertain. There were a great many circumstances which he did not remember and others which he could not fully explain. From the testimony showing that he had been drinking and his own testimony showing that he did not have any clear recollection of just what happened at about the time the homicide occurred, the jury could reasonably have drawn the conclusion that his mind was clouded by the effects of intoxicating liquor. Therefore, the charge of the court was within the purview of the evidence and was a charge more favorable to defendant than against him.

The plaintiff in error contends that the charge given by the court on the question of reasonable doubt, which was:

"A reasonable doubt, gentlemen, is just what the term implies. It is a doubt founded in reason and for which you could give a reason. It is a doubt arising from the testimony or lack of testimony such as would cause you gentlemen to hesitate in the transaction of ordinary affairs of life. It is not a whimsical, fanciful, fictitious doubt which one could raise about any and everything.

"A reasonable doubt is that state of the case which, after an entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge."—was erroneous.

We do not think the charge is amenable to the objection urged by the plaintiff in error. If the charge had read, "A reasonable doubt is a doubt founded in reason. To be convinced beyond a reasonable doubt you must be so thoroughly convinced that you would act upon the conviction in the transaction of ordinary affairs of life,"—it would have possessed the infirmity complained of. See Lovett v. State, 30 Fla. 142, 12 Sou. 452.

Here the language of the charge means the converse. It does not mean that entertaining such a doubt as may be produced in the minds of the jury by the evidence or lack of evidence they would act affirmatively in the ordinary affairs of life, but it means that if the evidence or lack of evidence raises such a doubt as to the guilt of the accused in the minds of the jury as would cause them to hesitate to act affirmatively in the ordinary affairs of life, then they are not convinced beyond a reasonable doubt and should not convict.

We do not approve the charge as being a model, but it was certainly not unfavorable to the defendant because any sort of a whimsical, fanciful or fictitious doubt might cause one to hesitate to act affirmatively in the ordinary affairs of life.

Other questions presented challenging the correctness of the charge of the court have been considered but we find no necessity to discuss them, as the charge of the court when taken in its entirety was without prejudice to the defendant.

The seventh question is: "Must the defendant or his counsel be present at every stage of the trial where the defendant is being tried under the charge of first degree murder?" and the contention is that after the jury had returned to the court pursuant to having viewed the premises where the homicide occurred, the court ordered a recess in the absence of the defendant. It is not shown that defendant could have suffered any injustice or prejudice by this action of the court. Therefore, if any error occurred in this regard, it was harmless error.

"May the State's attorney in cross examination of defendant, require him to answer touching his knowledge of the deceased's family and then state, 'Then you were willing for his family to suffer' "?

The record shows that during the progress of the trial while defendant was on the stand as a witness in his own behalf and was being examined by the Satte's attorney, the following occurred:

"I told them to say they were inside and they thought it was suicide.

"Q. Told them to say it was suicide?

"A. That they thought it was suicide.

"Q. Who did you tell that to?

"A. Cracker Gaskins and Doris Johnson and Dorothy Johnson and Bob Buzzard.

"Q. And, did you tell them you wanted them to say that they were on the inside when the shooting took place?

"A. I told them to say that they were inside and that they didn't know what happened, but they thought it was suicide—if I remember correctly.

"Q. Had you already placed that pistol in Mr. Schafer's hand or did you then go back and place it in his hand?

"A. I had already did it.

"Q. Then you immediately conceived the thought of protecting yourself by placing that pistol in his hand and then telling the other people there to say that they thought it was suicide; is that right?

"A. I thought—that's all I could think to do—that's all.

"Q. And you and Mr. Schafer, you say, had been friends for ten years?

"A. In the neighborhood of ten years, yes sir.

"Q. He had visited you at that place and in your home at various times during that time, hadn't he?

"A. He had been there several times; I don't know how many times.

"Q. And, you and he were there around your place and

had your friends all there together at that time and at other times, hadn't you?

"A. Yes sir, he had been there several times.

"Q. And, you conceived the idea, after that shooting, of protecting yourself and your family by making it appear that this man had committed suicide, didn't you?

"A. Well, sir, I thought that that was all there was to do; I didn't—Red was—

"Q. As a matter of fact, you did that in order to protect yourself, didn't you?

"A. I don't know; that's all I know why I did it; I didn't know what else to do; I was so shocked and torn up, I thought that was all there was to do.

"Q. Do you know Mr. Schafer's family?

"A. No, sir; I believe he said he and his first wife had separated; and he had married again since he went to Georgia.

"Q. You knew he had a family, didn't you?

"A. Yes.

"Q. Then, you were willing for his family to suffer—

"Mr. Harris: 'I object to that question; it calls for a conclusion of the witness and is not in the range of proper or legitimate cross examination of anything brought out on the direct.'

"By the court: 'I think it's proper cross examination; objection overruled.' To which ruling of the court the defendant did, then and there, except.

"Q. You were willing to throw the burden of that occurrence on his family and make it appear that he had committed suicide in order to protect yourself; is that a fact?

"A. No sir, I didn't want to throw the burden on his family; I had rather, to have my way about it, I had rather

been shot myself than for him to have been shot, because I'm not married.

"Q. Yes, and you never told a soul that he was not a suicide until you admitted it before Judge Petteway at the hearing on an application for bond, did you?

"A. No sir."

This examination went to the credibility of the witness and, therefore, was not beyond the scope of cross examination.

We have studied the entire record in the light of the splendid brief filed and find no reversible error reflected therein.

The judgment should be, and is, affirmed.

So ordered.

Affirmed.

TERRELL, C. J., and THOMAS, J., concur.

CHAPMAN, J., concurs in opinion and judgment.

Justices WHITFIELD and BROWN not participating as authorized by Section 4687, Compiled General Laws of 1927, and Rule 21-A of the Rules of this Court.

## ON REHEARING

PER CURIAM.—On reconsideration of this case after rehearing granted because plaintiff-in-error's request for oral argument had been overlooked, and after hearing oral argument pursuant to rehearing granted, we conclude that our opinion and judgment entered herein on the 2nd day of February, 1940, in which we affirmed the judgment of the lower court should be adhered to.

It is so ordered.

TERRELL, C. J., WHITFIELD, BUFORD, CHAPMAN and THOMAS, J. J., concur.

Justice BROWN not participating as authorized by Section 4687, Compiled General Laws of 1927, and Rule 21-A of the Rules of this Court.